*4/18/24*

## SUMMONS

| | |
|---|---|
| State of New Mexico<br>County of Dona Ana<br>Third Judicial District Court<br>201 W. Picacho Ave., #A<br>Las Cruces, New Mexico 88005<br>(575) 523-8200 | Case Number:<br>D-307-CV-2024-00839<br><br>Assigned Judge:<br>James T. Martin |
| Plaintiff: HSBC Bank USA, National Association as Trustee for Renaissance Home Equity Loan Asset-Backed Certificates, Series 2007-3<br>v.<br>Defendant(s): Michael Annabi, Perla Annabi, Nationsbanc Mortgage Corporation, Capital One Bank (USA), N.A., NPG of Texas, L.P. d/b/a/ KVIA TV-7, United States Department of Justice, Department of the Treasury - Internal Revenue Service, Sunny Ridge Homeowners Association Inc., a New Mexico nonprofit corporation, and Cross River Bank c/o Sunlight Financial | Defendant:<br>United States Department of Justice – Civil Process Clerk |

**TO THE ABOVE NAMED DEFENDANT**: Take notice that:

1. A lawsuit has been filed against you. A copy of the lawsuit is attached. The Court issued this Summons.

2. You must respond to this lawsuit in writing. You must file your written response with the Court no later than sixty (60) days from the date you are served with this Summons. (The date you are considered served with the Summons is determined by Rule 1-004 NMRA) The Courts address is listed above.

3. You must file (in person or by mail) your written response with the Court. When you file your response, you must give or mail a copy to the person who signed the lawsuit.

4. If you do not respond in writing, the Court may enter judgment against you as requested in the lawsuit.

5. You are entitled to a jury trial in most types of lawsuits. To ask for a jury trial, you must request one in writing and pay a jury fee.

6. If you need an interpreter, you must ask for one in writing.

7. You may wish to consult a lawyer. You may contact the State Bar of New Mexico for help finding a lawyer at www.nmbar.org; 1-800-876-6657; or 1-505-797-6066.

Dated at Las Cruces_____, New Mexico, this 10th day of April_____, 2024

~~Josephine A. Gomez~~
CLERK OF DISTRICT COURT

By: _Rebecca Hernandez_
_Deputy_



ROSE RAMIREZ & ASSOCIATES, P.C.
Attorneys for Plaintiff
Amanda Gates
7430 Washington Street, NE
Albuquerque, NM 87109
Phone: 505-833-3036
Fax: 505-833-3040
Amanda.Gates@RRAfirm.com
ISSUED PURSUANT TO RULE 1-004 OF THE NEW MEXICO RULES
CIVIL PROCEDURE FOR DISTRICT COURTS

Exhibit A

## SUMMONS

| | |
|---|---|
| State of New Mexico<br>County of Dona Ana<br>Third Judicial District Court<br>201 W. Picacho Ave., #A<br>Las Cruces, New Mexico 88005<br>(575) 523-8200 | Case Number:<br>D-307-CV-2024-00839<br><br>Assigned Judge:<br>James T. Martin |
| Plaintiff: HSBC Bank USA, National Association as Trustee for Renaissance Home Equity Loan Asset-Backed Certificates, Series 2007-3<br>v.<br>Defendants: Michael Annabi, Perla Annabi, Nationsbanc Mortgage Corporation, Capital One Bank (USA), N.A., NPG of Texas, L.P. d/b/a/ KVIA TV-7, United States Department of Justice, Department of the Treasury - Internal Revenue Service, Sunny Ridge Homeowners Association Inc., a New Mexico nonprofit corporation, and Cross River Bank c/o Sunlight Financial | Defendant:<br>Department of the Treasury - Internal Revenue Service – Civil Process Clerk |

**TO THE ABOVE NAMED DEFENDANT**: Take notice that:

**1.** A lawsuit has been filed against you. A copy of the lawsuit is attached. The Court issued this Summons.

**2.** You must respond to this lawsuit in writing. You must file your written response with the Court no later than sixty (60) days from the date you are served with this Summons. (The date you are considered served with the Summons is determined by Rule 1-004 NMRA) The Courts address is listed above.

**3.** You must file (in person or by mail) your written response with the Court. When you file your response, you must give or mail a copy to the person who signed the lawsuit.

**4.** If you do not respond in writing, the Court may enter judgment against you as requested in the lawsuit.

**5.** You are entitled to a jury trial in most types of lawsuits. To ask for a jury trial, you must request one in writing and pay a jury fee.

**6.** If you need an interpreter, you must ask for one in writing.

**7.** You may wish to consult a lawyer. You may contact the State Bar of New Mexico for help finding a lawyer at www.nmbar.org; 1-800-876-6657; or 1-505-797-6066.

Dated at _Las Cruces_____, New Mexico, this 10th day of April_____, 2024

~~Josephine A. Gomez~~
CLERK OF DISTRICT COURT

By _Rebecca Hernandez_
Deputy

[D.C. SEAL]

ROSE RAMIREZ & ASSOCIATES, P.C.
Attorneys for Plaintiff
Amanda Gates
7430 Washington Street, NE
Albuquerque, NM 87109
Phone: 505-833-3036
Fax: 505-833-3040
Amanda.Gates@RRAfirm.com

UED PURSUANT TO RULE 1-004 OF THE NEW MEXICO RULES
CIVIL PROCEDURE FOR DISTRICT COURTS

STATE OF NEW MEXICO )
               ) ss
COUNTY OF _____ )

     I, being duly sworn, on oath, state that I am over eighteen (18) years of age and not a party to this lawsuit, and that I served this summons in _____ County on the _____ day of _____, _____, by delivering a copy of this Summons, with a copy of Complaint attached, in the following manner:

### (*Check one box and fill in appropriate blanks*)

[ ]    to Defendant, _____ (*used when Defendant accepts a copy of Summons and Complaint or refuses to accept the Summons and Complaint*).

[ ]    to the Defendant by [mail] [courier service] as provided by Rule 1-004 NMRA (*used when service is by mail or commercial courier service*).

    After attempting to serve the Summons and Complaint on the Defendant by personal service or by mail or commercial courier service, by delivering a copy of this Summons, with a copy of Complaint attached, in the following manner:

[ ]    to _____, a person over fifteen (15) years of age and residing at the usual place of abode of Defendant, _____, (*used when the Defendant is not presently at place of abode*) and by mailing a copy of the Summons and Complaint by first class mail to said Defendant at _____
_____ (*insert Defendant's last known mailing address*).

[ ]    to _____, the person apparently in charge at the actual place of business or employment of Defendant, _____, and by mailing a copy of the Summons and Complaint by first class mail to said Defendant at _____ (*insert Defendant's business address*) and at _____ (*insert Defendant's last known mailing address*).

[ ]    to _____, an agent authorized to receive service of process on behalf of Defendant, _____.

[ ]    to _____, [parent] [guardian] [custodian] [conservator] [guardian ad litem] of Defendant, _____ (*used when Defendant is a minor or an incompetent person*).

[ ]    to _____ (name of person), _____, (*Title of person authorized to receive service of process. Use this alternative when the Defendant is a corporation or an association subject to a suit under a common name, a land grant board of trustees, the State of New Mexico, or any political subdivision*).

Fees: _____

_____
Signature of person making service

_____
Title (if any)

Subscribed and sworn to before me this _____ day of _____, _____ 20____.

_____
Judge, Notary or other Officer
authorized to administer oaths

_____
Official Title

## USE NOTE

1. Unless otherwise ordered by the Court, this Return is not to be filed with the Court prior to service of the Summons and Complaint on the Defendant.

2. If service is made by the sheriff or a deputy sheriff of a New Mexico county, the signature of the sheriff or deputy sheriff need not be notarized.

[Adopted effective August 1, 1988; as amended by Supreme Court Order 05-8300-01, effective March 1, 2005; by Supreme Court Order 07-8300-16, effective August 1, 2007; by Supreme Court Order No. 12-8300-026, effective for all cases filed or pending on or after January 7, 2013.]

FILED
3rd JUDICIAL DISTRICT COURT
Dona Ana County
4/5/2024 10:42 AM
BERNICE A. RAMOS
CLERK OF THE COURT
Melissa Wood

STATE OF NEW MEXICO
COUNTY OF DONA ANA
THIRD JUDICIAL DISTRICT COURT

No.   D-307-CV-2024-00839   Martin, James T.

HSBC BANK USA, NATIONAL ASSOCIATION AS TRUSTEE FOR
RENAISSANCE HOME EQUITY LOAN ASSET-BACKED
CERTIFICATES, SERIES 2007-3,

   Plaintiff,

v.

MICHAEL ANNABI, PERLA ANNABI, NATIONSBANC
MORTGAGE CORPORATION, CAPITAL ONE BANK (USA), N.A.,
NPG OF TEXAS, L.P. D/B/A/ KVIA TV-7, UNITED STATES
DEPARTMENT OF JUSTICE, DEPARTMENT OF THE TREASURY -
INTERNAL REVENUE SERVICE, SUNNY RIDGE HOMEOWNERS
ASSOCIATION INC., A NEW MEXICO NONPROFIT
CORPORATION AND CROSS RIVER BANK C/O SUNLIGHT
FINANCIAL,

   Defendants.

## COMPLAINT FOR FORECLOSURE

**COMES NOW** Plaintiff, HSBC Bank USA, National Association as Trustee for
Renaissance Home Equity Loan Asset-Backed Certificates, Series 2007-3, by and through its
attorneys, Rose Ramirez & Associates, P.C. (Matthew Goen), and for its cause of action states:

1.     The real property that is the subject matter of this action is located in Doan Ana
County, New Mexico, and venue is properly before this Court.

2.     Defendants, Perla Annabi and Michael Annabi, upon information and belief, are
residents of Dona Ana County, New Mexico. Defendants, NationsBanc Mortgage Corporation,
Capital One Bank (USA), N.A, NPG of Texas, L.P. d/b/a/ KVIA TV-7, Sunny Ridge
Homeowners Association Inc., a New Mexico nonprofit corporation and Cross River Bank c/o
Sunlight Financial, are doing business in New Mexico. Defendants, Department of the Treasury

– Internal Revenue Service and United States Department of Justice, are governmental entities of the United States of America.

3.    On or about April 13, 2007, Defendants, Perla Annabi and Michael Annabi, executed, and delivered to Delta Funding Corporation, a Fixed Rate Stepped Payment Note in the principal sum of $252,000.00 and bearing interest at the rate of 8.3900% *per annum* (hereinafter the "Note"). A true and correct copy of the original Note is attached hereto and incorporated herein as Exhibit "A."

4.    On or about January 1, 1753, as security for repayment of the debt evidenced by the Note, Defendants, Perla Annabi and Michael Annabi, executed a Mortgage in favor of Mortgage Electronic Registration Systems, Inc., as nominee for Delta Funding Corporation, which was filed for record in Dona Ana County, New Mexico, on April 18, 2007, in Book 806, at Page 1091 (hereinafter the "Mortgage"). A copy of the Mortgage is attached hereto and incorporated herein as Exhibit "B."

5.    The Mortgage was assigned to HSBC Bank USA, National Association as trustee for Renaissance Home Equity Loan Asset-Backed Certificates, Series 2007-3, its successors and assigns through an Assignment of Mortgage dated September 14, 2020, which was filed for record in Dona Ana County, New Mexico, on September 16, 2020, as Document No. 2023165. A copy of said Assignment is attached hereto and incorporated herein as Exhibit "C."

6.    On or about October 11, 2013, as further security for the Note, Defendants, Perla Annabi and Michael Annabi, executed and delivered to Ocwen Loan Servicing, LLC a Loan Modification Agreement. Said Loan Modification Agreement amended the terms of the original Note and Mortgage, and provided for payment of the unpaid principal balance of $231,562.00, bearing interest at the rate of 2.0000%. A copy of said Loan Modification Agreement is attached

hereto and incorporated herein as Exhibit "D."

7.    Subsequent to execution, the Note was indorsed to HSBC Bank USA, National Association as Indenture Trustee Under the Applicable Agreement from Delta Funding Corporation. The Note was then indorsed in blank from HSBC Bank USA, National Association as Indenture Trustee Under the Applicable Agreement. The original Note is now in the physical possession of HSBC Bank USA, National Association as Trustee for Renaissance Home Equity Loan Asset-Backed Certificates, Series 2007-3, through its counsel, acting as bailee. The original Note is indorsed in blank and has been transferred by possession alone. *See* NMSA 1978, § 55-3-205(b); *Bank of New York v. Romero,* 2014- NMSC-007, ¶ 24. The original Note was transferred to Plaintiff prior to the filing of this Complaint. Therefore, Plaintiff is the real party in interest.

8.    According to the terms of the Mortgage, Defendants, Perla Annabi and Michael Annabi, mortgaged, granted and conveyed to the mortgagee the following property located in Doan Ana County (hereinafter the "Property"):

> Lot numbered 20 of SUNNY RIDGE SUBDIVISION, Dona Ana County, New Mexico, as the same is shown and designated on the plat of said SUNNY RIDGE SUBDIVISION, filed in the Office of the County Clerk of Dona Ana County New Mexico on July 1, 1996, in Plat Book 18, Folio 496-497,

including any improvements, fixtures, and attachments, such as, but not limited to, manufactured homes. The Property is generally described with the street address of 146 Cherry Hill Lane, Santa Teresa, New Mexico 88008. If there is a conflict between the legal description and the street address, the legal description shall control.

9.    Defendants, Perla Annabi and Michael Annabi, are in default on said Note and Loan Modification Agreement, having failed to make payment when due. Defendants have

failed to cure the default. Plaintiff is, therefore, exercising herein its option to accelerate the entire remaining balance due and owing on said Note as of the date of default and to foreclose its Mortgage.

10. Because of the Defendants' default under the Note and Mortgage for failure to pay the Note according to its terms, Plaintiff is entitled, under the terms of the Mortgage, to foreclose the Mortgage upon the Property.

11. Because of the Defendants' default under the Note for failure to pay the Note according to its terms, and Plaintiff's acceleration of the amounts due under the Note, Plaintiff is entitled, under the terms of the Note, to recover its costs and expenses for enforcing the Note, including reasonable and customary attorney fees incurred for enforcing the Note.

12. Because of the Defendants' default under the Note and Mortgage for failure to pay the Note according to its terms, and Plaintiff's acceleration of the amounts due under the Note, Plaintiff is entitled, under the terms of the Mortgage, to recover its expenses, including reasonable attorney fees and costs of title evidence, incurred for enforcing the Mortgage.

13. Because of the Defendants' default under the Note and Mortgage for failure to pay the Note according to its terms, it has become necessary for the Plaintiff to retain the undersigned attorneys to enforce the terms of the Note and Mortgage, including foreclosure of the Mortgage.

14. Plaintiff is entitled to the appointment of a Receiver by the Court pursuant to the terms of the Mortgage and NMSA 1978, Section 44-8-4 (1995).

15. The Mortgage should be foreclosed in the manner prescribed by law in order to satisfy the indebtedness owed by Defendants, Perla Annabi and Michael Annabi, and the judgment should provide for the immediate sale of the Property, permitting Plaintiff, or its

designee or assignee, to bid in the amount of its indebtedness, in an amount to be determined by this Court for all remaining unpaid principal, interest, court costs, attorney fees, and other charges as may be determined.

16. Upon information and belief, Defendant, NationsBanc Mortgage Corporation, claims or may claim an interest in the Property that is the subject of this action pursuant to a Mortgage initially to Mortgage Portfolio Services, Inc., dated January 21, 1998, which was filed for record in Dona Ana County, New Mexico, on January 21, 1998, in Book 151, Page 1955, as Document No. 001438 and re-filed for record in Dona Ana County, New Mexico, on May 19, 1998, in Book 131, at Page 1767. Said Mortgage was assigned to Nationsbanc Mortgage Corporation through an Assignment of Mortgage, which was filed for record in Dona Ana County, New Mexico, on August 17, 1998, in Book 143, at Page 971. Upon information and belief, Defendant, NationsBanc Mortgage Corporation, was fully paid off and Defendant, NationsBanc Mortgage Corporation, has failed to file a release of lien and/or satisfaction of mortgage. As the mortgage has been fully paid off, Defendant, NationsBanc Mortgage Corporation's interest has been satisfied and any interest is therefore inferior and subordinate to that of Plaintiff.

17. Upon information and belief, Defendant, Capital One Bank (USA), N.A., claims or may claim an interest in the Property pursuant to a Transcript of Judgment, dated December 28, 2015, which was filed for record in Dona Ana County, New Mexico, on January 13, 2016, as Document No. 1600894. Said interest is subordinate and inferior to that of Plaintiff, and should be foreclosed herein.

18. Upon information and belief, Defendant, NPG of Texas, L.P. d/b/a/ KVIA TV-7, claims or may claim an interest in the Property pursuant to a Transcript of Judgment, dated

August 16, 2017, which was filed for record in Dona Ana County, New Mexico, on August 29, 2017, as Document No. 1720174. Said interest is subordinate and inferior to that of Plaintiff, and should be foreclosed herein.

19. Upon information and belief, Defendant, United States Department of Justice, claims or may claim an interest in the Property pursuant to the following:

a) a Notice of Lien, dated August 27, 2018, which was filed for record in Dona Ana County, New Mexico, on August 28, 2018, as Document No. 1820562; and

b) a Notice of Lien, dated August 27, 2018, which was filed for record in Doan Ana County, New Mexico, on August 28, 2018 as Document No. 1820563.

Said interest is subordinate and inferior to that of Plaintiff, and should be foreclosed herein.

20. Upon information and belief, Defendant, Department of the Treasury – Internal Revenue Service, claims or may claim an interest in the Property pursuant to a Notice of Federal Tax Lien, dated August 1, 2019, which was filed for record in Doan Ana County, New Mexico, on August 14, 2019, as Document No. 1917874. Said interest is subordinate and inferior to that of Plaintiff, and should be foreclosed herein.

21. Upon information and belief, Defendant, Sunny Ridge Homeowner's Association Inc., a New Mexico nonprofit corporation, claims or may claim an interest in the Property pursuant to a Notice of Claim of Lien, dated May 25, 2021, which was filed for record in Dona Ana County, New Mexico, on June 4, 2021, as Document No. 2117926. Said interest is subordinate and inferior to that of Plaintiff, and should be foreclosed herein.

22. Upon information and belief, Defendant, Cross River Bank c/o Sunlight Financial, claims or may claim an interest in the Property pursuant to a UCC Financing

Statement, which was filed for record in Dona Ana County, New Mexico, on November 22, 2022, as Document No. 2229930. Said interest is subordinate and inferior to that of Plaintiff, and should be foreclosed herein.

23. To the extent that any claim of interest or lien of any Defendant or other party is determined by the Court to be valid, all such claims are inferior and subordinate to the lien held by Plaintiff, and Plaintiff is entitled to have its lien determined to be a first and prior lien upon the Property, superior to the rights of Defendants, Perla Annabi and Michael Annabi, and all Defendants and interveners who may hereafter be joined.

24. In the event that the Court determines that any valid prior lien upon the Property exists, Plaintiff requests that the Court enter an Order foreclosing the interest of any such valid prior lien upon payment of said lien, or in the alternative, to allow foreclosure of Plaintiff's Mortgage, subject to any valid prior lien.

25. Pursuant to the terms of the Mortgage, the redemption period shall be one (1) month.

26. Plaintiff has been required to employ counsel to obtain real estate searches and reports on the premises and has incurred abstracting expenses and costs in this proceeding, all of which are additional indebtedness secured by the Mortgage.

27. As of April 3, 2024, the principal balance due is $109,819.56, plus interest accruing on said amount at the rate of 2.0000% *per annum* from and including June 1, 2023, together with escrow advances, pre-acceleration late charges, property inspection fees, mortgage insurance premiums, BPO/Appraisal fees, property preservation fees, others fees, and attorney fees and costs incurred herein, all as provided by the Note and Mortgage.

**WHEREFORE**, Plaintiff prays judgment as follows:

A.      That Plaintiff have judgment against Defendants, Perla Annabi and Michael Annabi, and foreclosure judgment only as to Defendants, Nationsbanc Mortgage Corporation, Capital One Bank (USA), N.A., NPG of Texas, L.P. d/b/a/ KVIA TV-7, United States Department of Justice, Department of the Treasury - Internal Revenue Service, Sunny Ridge Homeowners Association Inc., a New Mexico nonprofit corporation and Cross River Bank c/o Sunlight Financial, as set forth above including the principal amount due plus interest at the rate of 2.0000% until all of said principal and interest be paid, together with escrow advances, late charges, property inspection fees, property maintenance fees, appraisal fees, mortgage insurance premiums, miscellaneous fees, and attorney fees and costs incurred herein, all as provided by the Note and Mortgage.

B.      That Plaintiff's Mortgage, and all other liens and interests, be foreclosed, and the Property securing the same be sold according to law and practice of this Court to pay the first lien held by Plaintiff, the proceeds thereof to be applied to payment of the amount due to Plaintiff, as set forth above, and that the lien held by Plaintiff be declared prior and paramount to all Defendants, and anyone claiming subsequent to Plaintiff's Mortgage, and all persons claiming under or through all Defendants, and all other persons bound by these proceedings, be barred and foreclosed of all right, title and interest to the Property, if appropriate for deficiency judgment against Defendants, Perla Annabi and Michael Annabi, and, upon the sale of the Property, that any excess over and above the amounts due to Plaintiff be paid in accordance with the further orders of this Court.

C.      That a Receiver be appointed by the Court to take possession and control of the Property and to collect and receive any rents, issues and profits thereof during the foreclosure

proceedings, and to apply said proceeds to payment of the costs incurred by the Receiver, with any remaining proceeds to be applied as may be directed by the Court, principally to pay the Note from Defendants, Perla Annabi and Michael Annabi, to Plaintiff.

D.  To appoint a Special Master to effect sale of the Property upon entry of judgment for foreclosure in accordance with the orders of this Court and applicable New Mexico law.

E.  For an order that Plaintiff, or other parties to this action, may become purchasers at sale; that the appointed Special Master execute a deed to the purchaser; and that the purchaser be delivered possession of the Property upon the production of a Special Master's Deed thereto.

F.  For the entry of an Order of Forcible Entry and Detainer, directing that Plaintiff be allowed immediate entry and possession of the Property, and that the Court issue a Writ of Assistance, if necessary, to enable the purchaser at sale to take possession of the Property.

G.  That the interests of all Defendants, and anyone claiming by or through them, are hereby foreclosed, subject only to rights of redemption, if any, as set forth herein.

H.  That Plaintiff have judgment as set forth herein, for all attorney's fees, costs, interest, and other charges expended in this proceeding, and for such other and further relief as the Court deems just and proper.

ROSE RAMIREZ & ASSOCIATES, P.C.

By */s/Matthew Goen*
MATTHEW GOEN
Attorneys for Plaintiff
7430 Washington Street, NE
Albuquerque, NM 87109
Telephone: (505) 833-3036
Facsimile: (505) 833-3040
E-mail: Matthew.Goen@RRAfirm.com

## NOTICE REQUIRED BY THE
## FAIR DEBT COLLECTION PRACTICES ACT
## 15 U.S.C. § 1692, as amended

1.  The amount of the debt is set forth in the Complaint attached hereto.

2.  The Plaintiff named in the attached Summons and Complaint is the creditor to whom the debt is owed.

3.  Unless you dispute the validity of the debt, or any portion thereof, within thirty (30) days after receipt of this notice, the debt will be assumed to be valid by the law firm providing this notice.

4.  If you notify the law firm providing this notice in writing within thirty (30) days of the receipt of this notice that the debt or any portion thereof is disputed, this law firm will obtain verification of the debt, and a copy of the verification will be mailed to you by this law firm.

5.  If the creditor named as Plaintiff in the attached Summons and Complaint is not the original creditor, and if you make a written request to this law firm within thirty (30) days from the receipt of this notice, this law firm will provide you with the name and address of the original creditor.

6.  This notice should not be construed as a thirty (30) day grace period. The creditor may pursue collection efforts immediately and not wait thirty (30) days.

### NOTICE TO SERVICEMEMBERS AND THEIR DEPENDENTS

The Servicemembers' Civil Relief Act (50 U.S.C. App. §§ 501-596), as amended, ("SCRA") grants active service members of the United States Armed Forces or a dependent of such an active service member certain rights, which include the temporary suspension of judicial and administrative proceedings against active service members and their dependents.

IF YOU BELIEVE YOU QUALIFY for protection under the SCRA, please contact by mail, fax, or in person:

Rose Ramirez & Associates, P.C.
Attention: Elizabeth Dranttel
7430 Washington Street, NE
Albuquerque, NM 87109
Telephone: (505) 833-3036
Facsimile: (505) 833-3040

For any questions, please call (505) 833-3036

Please note that you may wish to consult an attorney to help you determine what rights you may have, if any, under the SCRA.

5120-284-FF 8104933.docx jmf

The law firm providing this notice is:

ROSE RAMIREZ & ASSOCIATES, P.C.
AMANDA GATES
Attorneys for Plaintiff
7430 Washington Street, NE
Albuquerque, NM 87109
Telephone: (505) 833-3036
Facsimile: (505) 833-3040
E-mail: Amanda.Gates@RRAfirm.com

Any written requests made pursuant to this notice should be delivered to this firm.

IF YOU HAVE RECEIVED A DISCHARGE OF THE DEBT REFERENCED HEREIN IN A
BANKRUPTCY PROCEEDING, THIS NOTICE IS NOT AN ATTEMPT TO IMPOSE
PERSONAL LIABILITY UPON YOU FOR PAYMENT OF THAT DEBT. IN THE EVENT
YOU HAVE RECEIVED A BANKRUPTCY DISCHARGE, ANY ACTION TO ENFORCE
THE DEBT WILL BE TAKEN AGAINST THE PROPERTY ONLY.

THIS IS AN ATTEMPT TO COLLECT A DEBT, AND ANY
INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

Loan Number: █████████

# FIXED RATE STEPPED PAYMENT NOTE

## THIS NOTE CONTAINS PROVISIONS WHICH WILL INCREASE MY MONTHLY PAYMENT.

| April 13, 2007 | Santa Teresa | NM |
|---|---|---|
| [Date] | [City] | [State] |

### 146 Cherry Hill Lane, Santa Teresa, NM 88008
[Property Address]

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 252,000.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Delta Funding Corporation**. I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 8.390%.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

### 3. PAYMENTS

#### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 01 day of each month beginning on Jun 01, 2007. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest it will be applied to interest before Principal. If, on May 1st, 2037, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 1000 Woodbury Road P.O. Box 9009 Woodbury, NY 11797 or at a different place if required by the Note Holder.

#### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $1,826.34 for the first 120 months of this Note, and thereafter will be in the amount of U.S. $2,065.67. The Note Holder will notify me prior to the date of a change in the amount of my monthly payment.

### 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note. I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment unless the Note Holder agrees in writing to those changes. However, if any partial Prepayment is made prior to the time of the payment change in Section 3(B) above, at the time of the payment change, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the unpaid principal in full on the Maturity Date at the interest rate set forth in Section 2 in substantially equal payments. A partial Prepayment made prior to the time of the payment change in Section 3(B) above will result in a decrease in the amount of my monthly payments due after the time of the payment change in Section 3(B) above. If the partial Prepayment is made after the time of the payment change in Section 3(B) above, the amount of my monthly payment will not decrease; however, the principal and interest required under this Note will be paid prior to the Maturity Date.

### 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.



EXHIBIT
A

6. **BORROWER'S FAILURE TO PAY AS REQUIRED**

(⁄.) **Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5% of my overdue payment of interest and/or principal and interest. I will pay this late charge promptly but only once on each late payment.

(B) **Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) **Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) **No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) **Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorney's fees.

7. **GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address. Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

8. **OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

9. **WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

10. **UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Lender may require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. If Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission, Lender also may require immediate payment in full. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender requires immediate payment in full under this Section 18, Lender will give me a notice which states this requirement. The notice will give me at least 30 days to make the required payment. The 30-day period will begin on the date the notice is given to me in the manner required by Section 15 of this Security Instrument. If I do not make the required payment during that period, Lender may act to enforce its rights under this Security Instrument without giving me any further notice or demand for payment.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ Seal
Perla   Annabi                                   -Borrower

_____ Seal
Michael   Annabi                                 -Borrower

_____ Seal
                                                 -Borrower

_____ Seal
                                                 -Borrower

*[Sign Original Only]*

# ALLONGE

RE: Perla  Annabi
    Michael  Annabi

LOAN #: ███████

PROPERTY ADDRESS:     146 Cherry Hill Lane,  Santa Teresa, NM 88008
    ADDRESS #2:
    ADDRESS #3:        ~~████████████████████████████████~~

PAY TO THE ORDER OF:
    HSBC BANK USA, NATIONAL ASSOCIATION AS
    INDENTURE TRUSTEE UNDER THE APPLICABLE AGREEMENT

WITHOUT RECOURSE
    ~~████████████████████████████████~~
    **DELTA FUNDING CORPORATION**

BY: *Carol Hollmann*

————————————————————————————
Carol Hollmann, Vice President

Loan #███████

## ALLONGE TO NOTE

This endorsement is a permanent part of the Note in the amount of $252,000.00

NOTE DATE: 04/13/2007

BORROWER NAME: PERLA ANNABI
AND MICHAEL ANNABI

PROPERTY: 146 CHERRY HILL LANE, SANTA TERESA, NM 88008

PAY TO THE ORDER OF:

HSBC BANK USA, NATIONAL ASSOCIATION AS TRUSTEE FOR RENAISSANCE HOME
EQUITY LOAN ASSET-BACKED CERTIFICATES, SERIES 2007-3

WITHOUT RECOURSE:

HSBC BANK USA, NATIONAL ASSOCIATION AS INDENTURE TRUSTEE UNDER THE
APPLICABLE AGREEMENT

Signer: Man Yu Wong (Cindy)
Title: Senior Vice President

Loan# ▮▮▮▮▮▮

## ALLONGE TO NOTE

This endorsement is a permanent part of the Note in the amount of $252,000.00

**NOTE DATE:** 4/13/2007

**BORROWER NAME:** Perla Annabi
Michael Annabi

**PROPERTY:** 146 Cherry Hill Lane, Santa Teresa, NM 88008

**PAY TO THE ORDER OF:**

**WITHOUT RECOURSE:**
**HSBC BANK USA, NATIONAL ASSOCIATION AS TRUSTEE FOR RENAISSANCE HOME EQUITY LOAN ASSET-BACKED CERTIFICATES, SERIES 2007-3, BY ITS ATTORNEY IN FACT, OCWEN LOAN SERVICING, LLC**

Signer: **Yamile Shields**
Title: **Servicing Operations Specialist**

Dona Ana Title Co., inc
GF #

After Recording Return To:

Delta Funding Corporation
1000 Woodbury Rd. PO Box 9009
Woodbury, NY 11797
Attention: Documentation Control Dept. 3rd floor.

|Space Above This Line For Recording Data| _____

## MORTGAGE

LENDER: (Delta Funding Corporation)
LOAN #:

NOMINEE: MERS, MIN Number#:

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **April 13th, 2007,** together with all Riders to this document.
**(B) "Borrower"** is **Perla Annabi, Michael Annabi.** Borrower is the mortgagor under this Security Instrument.
**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(D) "Lender"** is **Delta Funding Corporation.** Lender is a **corporation or association** organized and existing under the laws of **New York.** Lender's address is **1000 Woodbury Road P.O. Box 9009, Woodbury, NY 11797.**
**(E) "Note"** means the promissory note signed by Borrower and dated **April 13th, 2007.** The Note states that Borrower owes Lender **two hundred fifty-two thousand** Dollars (**U.S. $252,000.00)** plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **May 1st, 2037.** This Security Instrument secures a maximum principal amount of up to 150% of the amount of the Note.
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property".
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

NEW MEXICO—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
*pages)*                                                (MERS)

Form 3032    1/01    *(page 1 of 15*

1091


**EXHIBIT**
**B**

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower:

☐ Adjustable Rate Rider     ☐ Condominium Rider     ☐ Second Home Rider
☐ Balloon Rider     ☐ Planned Unit Development Rider     ☐ Other(s) [specify]
☐ 1-4 Family Rider     ☐ Biweekly Payment Rider

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.

For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the:

County           of     Dona Ana

**See Property Description**

which currently has the address of **146 Cherry Hill Lane**

**Santa Teresa**        , **New Mexico 88008**      (Property Address):

Section:    Block:    Lot: 20

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

/093

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note. If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items.

1094

Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this

If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

1096

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

1097

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender.

1098

If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a nonrefundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a nonrefundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

1099

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

11/00

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

*/10/*

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

NEW MEXICO—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
*pages)* (MERS) Form 3032 1/01 *(page 12 of 15*

*1102*

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

1103

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

NEW MEXICO—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
*pages)*                                                                  (MERS)          Form 3032    1/01   *(page 14 of 15*

*llo4/*

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Redemption Period.** If this Security Instrument is foreclosed, the redemption period after judicial sale shall be one month.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Perla, Annabi

Seal
-Borrower

Michael  Annabi

Seal
-Borrower

Seal
-Borrower

Seal
-Borrower

**[Space Below This Line For Acknowledgement]**

**STATE OF NEW MEXICO**                    **SS:**

**COUNTY** Dona Ana

On this 13th day of April, 2007, before me, the undersigned, a Notary Public in and for said County, personally appeared Perla  Annabi, Michael  Annabi and acknowledged the execution of the foregoing instrument.

WITNESS my hand and official seal.

My Commission Expires June 6 2008

Notary Public

NEW MEXICO—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

(MERS)

Form 3032     1/01   (page 15 of 15)

1105

## EXHIBIT 'A'

File No.: ███████████████

Property:     **146 Cherry Hill Lane, Santa Teresa, NM 88008**

**Lot numbered 20 of SUNNY RIDGE SUBDIVISION, Dona Ana County, New Mexico, as the
same is shown and designated on the plat of said SUNNY RIDGE SUBDIVISION, filed in
the Office of the County Clerk of Dona Ana County, New Mexico on July 1, 1996 in Plat
Book 18, Folio 496-497.**

**A.P.N. 17-14448**

1| ap

The attached Mortgage covers real property principally improved by a one to four family dwelling.

Premises commonly known as:

146 Cherry Hill Lane,  Santa Teresa, NM 88008

DISTRICT                SECTION                BLOCK                LOT  20

Perla Annabi

Michael  Annabi

13650

3.30 **APR 18 2007** P M
800                    1097-1107

Sheucen



1107

When Recorded Return To:
PHH Mortgage Corporation
C/O Nationwide Title Clearing, Inc.
2100 Alt. 19 North
Palm Harbor, FL 34683



2023165          SEP 16, 2020 12:28:13 PM          PAGES: 1
ASSIGNMENT OF MORTGAGE          Deputy: Tonya Wall
Amanda López Askin, County Clerk, Dona Ana, NM



## ASSIGNMENT OF MORTGAGE

FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged, the undersigned, **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.** ("MERS"), AS **MORTGAGEE, AS NOMINEE FOR DELTA FUNDING CORPORATION, ITS SUCCESSORS AND ASSIGNS, (ASSIGNOR), (MERS Address: P.O. Box 2026, Flint, Michigan 48501-2026)** by these presents does convey, grant, assign, transfer and set over the described Mortgage with all interest secured thereby, all liens, and any rights due or to become due thereon to **HSBC BANK USA, NATIONAL ASSOCIATION AS TRUSTEE FOR RENAISSANCE HOME EQUITY LOAN ASSET-BACKED CERTIFICATES, SERIES 2007-3. WHOSE ADDRESS IS C/O PHH MORTGAGE CORPORATION, 5720 PREMIER PARK DRIVE, WEST PALM BEACH, FL 33407, ITS SUCCESSORS AND ASSIGNS, (ASSIGNEE).**

Said Mortgage is dated 04/13/2007, executed by **PERLA ANNABI AND MICHAEL ANNABI** to **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS MORTGAGEE, AS NOMINEE FOR DELTA FUNDING CORPORATION, ITS SUCCESSORS AND ASSIGNS,** and recorded in **Instrument # 13650**, of the records of **DONA ANA** County, **New Mexico.**

IN WITNESS WHEREOF, the undersigned has hereunto set its hand by its proper officers **this 14th day of September in the year 2020.**
MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), AS MORTGAGEE, AS NOMINEE FOR DELTA FUNDING CORPORATION, ITS SUCCESSORS AND ASSIGNS

**MARISSA LOPEZ**

**VICE PRESIDENT**

All persons whose signatures appear above have qualified authority to sign and have reviewed this document and supporting documentation prior to signing.

STATE OF FLORIDA
COUNTY OF PINELLAS
The foregoing instrument was acknowledged before me by means of [X] physical presence or [ ] online notarization on this 14th day of September in the year 2020, by Marissa Lopez as VICE PRESIDENT of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), AS MORTGAGEE, AS NOMINEE FOR DELTA FUNDING CORPORATION, ITS SUCCESSORS AND ASSIGNS, who, as such VICE PRESIDENT being authorized to do so, executed the foregoing instrument for the purposes therein contained. He/she/they is (are) personally known to me.

**TIA FIGUEROA**

**COMM EXPIRES: 10/14/2023**



TIA FIGUEROA
Notary Public - State of Florida
Commission # GG 922450
My Comm. Expires Oct 14, 2023
Bonded through National Notary Assn.

**Document Prepared By: Dave LaRose/NTC, 2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152**
MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. (MERS)    MIN
MERS PHONE 1-888-679-6377 MERS Mailing Address: P.O. Box 2026, Flint, MI

**EXHIBIT C**

# LOAN MODIFICATION AGREEMENT
## (SHARED APPRECIATION)

PLEASE READ THIS ENTIRE DOCUMENT CAREFULLY BEFORE SIGNING. THIS AGREEMENT AMENDS YOUR LOAN IN A NUMBER OF IMPORTANT WAYS, INCLUDING REDUCING THE PRINCIPAL YOU OWE. IF YOUR PROPERTY LATER APPRECIATES IN VALUE, HOWEVER, YOU WILL BE REQUIRED TO PAY BACK 25% OF THAT APPRECIATION CAPPED AT THE AMOUNT OF THE PRINCIPAL FORGIVENESS, LESS YOUR COST OF ANY IMPROVEMENTS.

Borrower ("I" or "my"): Perla Annabi Michael Annabi

Servicer ("Servicer"): Ocwen Loan Servicing, LLC, NMLS # 1852

Date of first lien Security Instrument ("Mortgage") and Note ("Note"): 4/13/2007

Loan Number: ▮▮▮▮▮▮

Property Address: 146 Cherry Hill Lane Santa Teresa, NM 88008      ("Property")

Servicer is offering this Loan Modification Agreement ("Agreement"), dated 9/11/2013, which modifies the terms of Borrower's home loan obligations as described below:

A.      the Mortgage, Deed of Trust, or Security Deed (the "Mortgage"), dated and recorded in the public records of Dona Ana County,

B.      the Note, of the same date and secured by the Mortgage (the "Note"), which covers the real and personal property described in the Mortgage located at 146 Cherry Hill Lane Santa Teresa, NM 88008 (the "Property").

**YOUR MORTGAGE, AS AMENDED BY THIS LOAN MODIFICATION AGREEMENT, SECURES AS AN OBLIGATORY FUTURE ADVANCE THE "SHARED APPRECIATION AMOUNT" TO THE SAME EXTENT AS IF SUCH SHARED APPRECIATION AMOUNT WAS INCURRED ON THE DATE OF THE LOAN MODIFICATION AGREEMENT. FOR PURPOSES OF THE FOREGOING THE TOTAL AMOUNT SECURED BY YOUR MORTGAGE ALSO SHALL INCLUDE INTEREST AND OTHER DISBURSEMENTS MADE BY THE SERVICER UNDER THE TERMS OF YOUR MORTGAGE.**

Pursuant to our mutual agreement to modify Borrower's Note and Mortgage (collectively the "Loan Documents") and in consideration of the promises, conditions and terms set forth below, the parties agree as follows:

1       **Preconditions to Modification.** I understand and agree that:

   A   TIME IS OF THE ESSENCE under this Agreement:

   B   The Loan Documents shall not be modified unless and until (i) the Servicer receives from me the initial payment in the amount and by the date required under Section 1.C. of this Agreement, (ii) the title insurance company insuring the lien of the Mortgage assures Servicer (or otherwise confirms to its satisfaction) that the Mortgage, as modified by this Agreement, continues to enjoy lien priority for the full amount of the Note and (iii) I receive from the Servicer a copy of this Agreement signed by the Servicer.

   C   I shall make an initial payment of  $1,031.39 on or before **10/1/2013**.

1

**EXHIBIT**

**D**

Annabi Perla
DLTA

2 **The Modification.** If all preconditions to the modification set forth in Section 1 of this Agreement have been met, then the Loan Documents shall automatically become modified on 11/1/2013 (the "Modification Effective Date"). I understand that if I have failed to make any payments as a precondition to this modification, this modification will not take effect and this Agreement will not be effective. If this Agreement becomes effective, the Loan Documents will be modified to include the following new terms which are acknowledged and agreed:

A **New Principal Balance:** The new principal balance of my Note shall be $231,562.00 (the "New Principal Balance"). This includes, to the extent permitted by law, all amounts and arrearages that are past due (including any unpaid late charges) less any amounts paid to the Servicer but not previously credited to my Loan. A portion of the New Principal Balance shall be deferred and may be forgiven as provided in Sections 2.B and 2.C. of this Agreement.

B **Deferred Principal Balance:** $61,512.00 of the New Principal Balance shall be deferred (the "Deferred Principal Balance"). The Deferred Principal Balance shall be treated as a non-interest bearing principal forbearance and I am not obligated to pay interest or make monthly payments on any portion of it.

C **Forgiveness of Deferred Principal Balance:** 100% of the Deferred Principal Balance is eligible for forgiveness in equal installments over three (3) years. Unless I default on my new payments to the extent that three (3) or more monthly payments become overdue and unpaid on the last day of any month, then the Servicer shall forgive one-third of the outstanding portion of my Deferred Principal Balance on each of the first, second and third anniversaries of the Modification Effective Date, respectively. Forgiveness of any such amounts will not result in a new payment schedule.

D **Interest Bearing Principal Balance and Interest Rate:** The portion of the New Principal Balance that is not deferred (i.e., New Principal Balance less Deferred Principal Balance) shall bear interest (the "Interest Bearing Principal Balance"). The Interest Bearing Principal Balance shall be $170,050.00 and interest at the rate of 2.00003% shall begin to accrue thereon as of 11/1/2013. If a default rate of interest is permitted under the Loan Documents, then in the event of any default under the Loan Documents, as amended by this Agreement, the interest that will be due will be the rate set forth in this Section 2.D.

E **New Payment Date, Schedule and Amounts to be Repaid:** The first new monthly payment on the Interest Bearing Principal Balance shall be due on 11/1/2013.

The payment schedule for the modified Loan is as follows:

| Years | Interest Rate | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Estimated Monthly Escrow Payment Amount* | Total Monthly Payment* | Payment Begins On | Number of Monthly Payments |
|---|---|---|---|---|---|---|---|
| 1-Loan's Maturity | 2.00003% | 11/1/2013 | $754.18 | $277.21, may adjust periodically | $1,031.39, may adjust periodically | 11/1/2013 | 283 |

*The escrow payments may be adjusted periodically in accordance with applicable law and therefore the total monthly payment may change accordingly.

I shall pay in full the Interest Bearing Principal Balance, all accrued and unpaid interest thereon and all other amounts due and owing by the earliest of: (i) the date on which my Note matures and is due and payable in full (the "Maturity Date"), (ii) a refinance or payoff of the entire Interest Bearing Principal Balance (a "Refinance Transaction"), or (iii) a sale or any transfer of the Property or a beneficial interest in the Property without the Servicer's consent that may require immediate payment in full under the terms of the Loan Documents (a "Sale Transaction"). I may also be required to pay the "Shared Appreciation Amount" as provided in Section 3 of this Agreement.

F **Pre-Payment of Note:** Provided I am not in default under the terms of this Agreement, in any pre-payment of the Note more than thirty (30) calendar days after the Modification Effective Date, the portion of the Deferred Principal Balance not yet forgiven pursuant to Section 2.C. shall be deducted from the payoff amount.

2

G  The terms in this Section 2 shall supersede any provisions to the contrary in the Loan Documents, including but not limited to, any provisions for an adjustable, step or simple interest rate, interest-only or other payment options, or any negative amortization features that would allow me to pay less than the interest due resulting in any unpaid interest to be added to the outstanding principal balance. I WILL BE IN DEFAULT IF I DO NOT COMPLY WITH THE TERMS OF THE LOAN DOCUMENTS, AS MODIFIED BY THIS AGREEMENT.

3  **Shared Appreciation.**

IF THE PROPERTY SECURING THE NOTE INCREASES IN VALUE AFTER THE MODIFICATION EFFECTIVE DATE, THERE MAY BE AN ADDITIONAL PAYMENT DUE, DEFINED IN THIS AGREEMENT AS THE "SHARED APPRECIATION AMOUNT". THE SHARED APPRECIATION AMOUNT RECOGNIZES CERTAIN IMPROVEMENTS I MAY MAKE TO THE PROPERTY IN THE FUTURE. IN NO EVENT SHALL THE SHARED APPRECIATION AMOUNT COLLECTED BE MORE THAN MY DEFERRED PRINCIPAL BALANCE ( $61,512.00).

A.  In addition to the amounts I am obligated to pay pursuant to Section 2 of this Agreement, upon the earliest of (i) the Maturity Date, (ii) a Refinance Transaction, or (iii) a Sale Transaction, I shall also pay principal in an amount equal to 25% of the future increase in value, if any, of the Property as more fully described below. This additional payment of principal is referred to in this Agreement as the "Shared Appreciation Amount". The Shared Appreciation Amount shall be determined by the Servicer as follows. (Note, the terms "Valuation" and "Subsequent Capital Improvements" as used below are defined in Sections 3.B and 3.C of this Agreement).

   I  **Maturity Date**: The Shared Appreciation Amount, if any, at the Maturity Date shall be 25% of the difference between the Valuation of the Property as of such date and $170,050.00 (the Interest Bearing Principal Balance as of the Modification Effective Date) less (i) any credit determined by Servicer for Subsequent Capital Improvements and (ii) any amount of appreciation in excess of the Deferred Principal Balance.

   II  **Refinance Transaction**: The Shared Appreciation Amount, if any, in connection with a Refinance Transaction shall be 25% of the difference between the Valuation of the Property as of the closing date of the Refinance Transaction and $170,050.00 (the Interest Bearing Principal Balance as of the Modification Effective Date) less (i) any credit determined by Servicer for Subsequent Capital Improvements and (ii) any amount of appreciation in excess of the Deferred Principal Balance.

   III  **Sale Transaction**: If the Property is sold, the manner in which the Shared Appreciation Amount, if any, is determined by the Servicer depends on whether or not the sale is at "Arm's Length." If the purchaser is a party unrelated to the seller, then the Servicer will generally determine that the transaction is Arm's Length. If, however, the purchaser is related to the seller, or other circumstances indicate that the transaction was not Arm's Length, or if there is a transfer of the Property or any beneficial interest in the Property without the Servicer's consent that may require immediate payment in full under the terms of the Loan Documents, then the Servicer may determine that the Sale Transaction is not Arm's Length.

      a  If the Sale Transaction is Arm's Length, then the Shared Appreciation Amount, if any, will be equal to 25% of the difference between the gross sale price of the Property and $170,050.00 (the Interest Bearing Principal Balance of the Modification Effective Date), less (i) any credit determined by Servicer for Subsequent Capital Improvements and (ii) any amount of appreciation in excess of the Deferred Principal Balance .

      b  If the Sale Transaction is not Arm's Length, then the Shared Appreciation Amount, if any, will be equal to 25% of the difference between the Valuation of the Property (as defined in Section 3.B.) as of the date of the sale or transfer and $170,050.00 (the Interest Bearing Principal Balance as of the Modification Effective Date), less (i) any credit determined by Servicer for Subsequent Capital Improvements and (ii) any amount of appreciation in excess of the Deferred Principal Balance.

B.  "Valuation" shall mean the dollar amount of the value of the Property determined by the Servicer under the following terms and conditions. In all of the circumstances enumerated in Section 3.A. other than an Arm's Length Sale Transaction, the Valuation shall include a Property appraisal from an independent licensed appraiser and, at Servicer's option, a third-party valuation based on such appraisal. I acknowledge and agree that such appraisal and third-party valuation (if any) are acceptable to me for assessing the value of the Property.

3

I also agree to provide Servicer with written notice of my intent to cause or permit a Refinance Transaction or Sale Transaction no more than sixty (60) days and not less than thirty (30) days in advance of said Refinance Transaction or Sale Transaction. At the time notice is provided, I agree to deliver documentation to the Servicer evidencing the gross amount of proceeds expected from or to be paid under such Refinance Transaction to enable Servicer to establish a Valuation of the Property and determine the Shared Appreciation Amount with respect to the Refinance Transaction. In the case of a Sales Transaction, I agree to provide the sales contract and any other information reasonably required by Servicer to enable Servicer to determine (i) whether or not it is an Arm's Length transaction and (ii) the Shared Appreciation Amount with respect to the Sales Transaction. I further agree and acknowledge that failure to provide the required notice of a Refinance Transaction or Sale Transaction may result in a delay in the Refinance Transaction or Sale Transaction and in my ability to pay off the Note and get the Mortgage released or reconveyed. **I agree that Servicer will not be responsible for any loss, damage, expense, claim, proceeding, cause of action, encumbrance, order, charge, cost or reduction in value caused or contributed to, directly or indirectly, by my failure to give such written notice of a Refinance Transaction or Sale Transaction to Servicer.**

C. "Subsequent Capital Improvements" that will qualify for credit under the Shared Appreciation Amount include only those improvements that are initiated and completed after the Modification Effective Date and are permanent structural improvements that have directly enhanced the value of the property. Repairs to the Property do not qualify as a Subsequent Capital Improvement. Servicer shall use the general guidelines adopted by the Internal Revenue Service to determine the difference between a Subsequent Capital Improvement and a repair. I agree to provide Servicer with the necessary support documentation, including, but not limited to, invoices and payment confirmation so that Servicer can determine whether any amounts for Subsequent Capital Improvements should be credited to the Shared Appreciation Amount. I acknowledge that failure to provide the necessary support documentation will result in no credit being provided for any Subsequent Capital Improvement I performed to the Property.

4   **Additional Agreements.** I agree to the following:

A  That all persons who signed the Loan Documents or their authorized representative(s) have signed this Agreement, unless (i) a borrower or co-borrower is deceased; (ii) the borrower and co-borrower are divorced and the property has been transferred to one spouse in the divorce decree, the spouse who no longer has an interest in the property need not sign this Agreement (although the non-signing spouse may continue to be held liable for the obligation under the Loan Documents); or (iii) the Servicer has waived this requirement in writing.

B  That this Agreement shall supersede the terms of any modification, forbearance, trial period plan or other workout plan that I previously entered into with Servicer.

C  That this Agreement constitutes notice that the Servicer's waiver as to payment of Escrow Items, if any, has been revoked, and I have been advised of the amount needed to fully fund my escrow account.

If this loan is currently escrowed for either taxes or insurance or both taxes and insurance, then Servicer will continue to collect the applicable escrow amount in addition to the monthly principal and interest payment. I agree to pay Servicer on the day payments are due under the Note and Mortgage as amended by this Agreement, until the loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Servicer under the Note and Mortgage; (d) mortgage insurance premiums, if any, or any sums payable to Servicer in lieu of the payment of mortgage insurance premiums in accordance with the Note and Mortgage; and (e) any community association dues, fees, and assessments that Servicer requires to be escrowed. These items are called "Escrow Items." I shall promptly furnish to Servicer all notices of amounts to be paid under this Section 4.C. I shall pay Servicer the Funds for Escrow Items unless Servicer waives my obligation to pay the Funds for any or all Escrow Items.

Servicer may waive my obligation to pay to Servicer Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, I shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Servicer and, if Servicer requires, shall furnish to Servicer receipts evidencing such payment within such time period as Servicer may require. My obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in the Note and Mortgage, as the phrase "covenant and agreement" is used therein. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Servicer may exercise its rights under the Note and Mortgage and this Agreement and pay such amount and I shall then be obligated to repay to

4

Servicer any such amount. Servicer may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Note and Mortgage, and, upon such revocation, I shall pay to Servicer all Funds, and in such amounts, that are then required under this Section 4.C.

Servicer may, at any time, collect and hold Funds in an amount (a) sufficient to permit Servicer to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA") and (b) not to exceed the maximum amount a Servicer may require under RESPA. Servicer shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Servicer, if Servicer is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Servicer shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Servicer shall not charge me for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Servicer pays me interest on the Funds and applicable law permits Servicer to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, Servicer shall not be required to pay me any interest or earnings on the Funds. Servicer and I may agree in writing, however, that interest shall be paid on the Funds. Servicer shall provide me, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Servicer shall account to me for the excess funds in accordance with RESPA. If there is a shortage or deficiency of Funds held in escrow, as defined under RESPA, Servicer shall notify me as required by RESPA, and I shall pay to Servicer the amount necessary to make up the shortage or deficiency in accordance with RESPA, but in no more than twelve (12) monthly payments.

Upon payment in full of all sums secured by the Note and Mortgage and this Agreement, Servicer shall promptly refund to me any Funds held by Servicer.

D   That all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and that except as otherwise specifically provided in, and as expressly modified by, this Agreement, the Servicer and I will be bound by, and will comply with, all of the terms and conditions of the Loan Documents.

E   That, as of the Modification Effective Date, I understand that the Servicer will only allow the transfer and assumption of the Loan, including this Agreement, to a transferee of my property as permitted under the Garn St. Germain Act, 12 U.S.C. Section 1701j-3. A buyer or transferee of the Property will not be permitted, under any other circumstance, to assume the Loan. Except as noted herein, this Agreement may not be assigned to, or assumed by, a buyer or transferee of the Property.

F   That, I will cooperate fully with Servicer in obtaining any title endorsement(s), or similar title insurance product(s), and/or subordination agreement(s) that are necessary or required by the Servicer's procedures to ensure that the modified mortgage Loan is in first lien position and/or is fully enforceable upon modification and that if, under any circumstance and not withstanding anything else to the contrary in this Agreement, the Servicer does not receive such title endorsement(s), title insurance product(s) and/or subordination agreement(s), then the terms of this Agreement will not become effective on the Modification Effective Date and the Agreement will be null and void.

G   That I will execute such other documents as may be reasonably necessary to either (i) consummate the terms and conditions of this Agreement; or (ii) correct the terms and conditions of this Agreement if an error is detected after execution of this Agreement. I understand that either a corrected Agreement or a letter agreement containing the correction will be provided to me for my signature. At Servicer's option, this Agreement will be void and of no legal effect upon notice of such error. If I elect not to sign any such corrective documentation, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement. I agree to deliver any such corrective documents within ten (10) days after I receive the Servicer's written request for such replacement.

H   That the mortgage insurance premiums on my Loan, if applicable, may increase as a result of the capitalization which will result in a higher total monthly payment. Furthermore, the date on which I may request cancellation of mortgage insurance may change as a result of the New Principal Balance.

I   Severability: Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be

5

effective and valid under applicable law, but if any provision of this Agreement shall be or become prohibited or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement.

J   In the case of multiple Borrowers, references to "I" and "my" throughout this Agreement shall mean "we" and "our", respectively.

In Witness Whereof, the Servicer and I have executed this Agreement.

Sign Here →  Perla Annabi          09 / 19 / 2013 Date

Sign Here →  Michael Annabi          9 , 19, 2013 Date

*All individuals on the title (even if not a borrower on the note) must sign this agreement. If there are more than two title holders to this property, please have them sign below. If no other title holders exist, please leave this section blank and return it with the rest of the agreement.

Sign Here → _____          ___/___/___ Date

Sign Here → _____          ___/___/___ Date

Servicer _____   BY _____

**OCT 1 1 2013**

Tatiana Kay
Contract Management Modifications Coordinator

Date

If applicable: _____

Mortgage Electronic Registration Systems, Inc. – Nominee for Servicer

6

## BALLOON DISCLOSURE

Borrower(s) ("I" or "me"): Perla Annabi Michael Annabi

Servicer ("Servicer"): *Ocwen Loan Servicing, LLC*

Date of first lien Security Instrument ("Mortgage") and Note ("Note"): 4/13/2007

Loan Number: [REDACTED]

Property Address: 146 Cherry Hill Lane Santa Teresa, NM 88008

THIS BALLOON DISCLOSURE is made this 11th day of September, 2013, and is incorporated into and shall be deemed to supplement the Modification Agreement (the "Agreement") of the same date given by the undersigned Borrower(s). The Agreement contains a balloon feature that requires the Borrower(s) to make an additional payment based on the future appreciation of the Property.

This means that even if I make all payments full and on time, the loan will not be paid in full by the final payment date. A single balloon payment will be due and payable in full on 5/1/2037, provided that all payments are made in accordance with the loan terms and the interest rate does not change for the entire loan term. The balloon payment may vary depending on the Shared Appreciation Amount as determined at the time of maturity.

Neither Ocwen Loan Servicing, LLC nor any lender to which this loan is transferred or assigned is under any obligation to finance the amount of the balloon payment. In addition, the value of the real estate securing this loan may change during the term of the loan. On the date the balloon payment becomes due, the value of the real estate may not be sufficient to secure a new loan in an amount equal to the balloon payment.

I/we have read the above disclosure and acknowledge receiving a copy by signing below.

*All individuals on the title (even if not a borrower on the note) must sign this agreement. If there are more than two title holders to this property, please have them sign below.

| | |
|---|---|
| _____ | 00-19-2013 |
| Borrower | Date |
| _____ | 9-19-2013 |
| Borrower | Date |

7

# SHARED APPRECIATION DISCLOSURE

## Important disclosure about the agreement in which you pay a part of any future increase in the value of your home. Please read carefully.

Borrower(s) ("I" or "me"): Perla Annabi Michael Annabi
Servicer ("Servicer"): *Ocwen Loan Servicing, LLC*
Date of first lien Security Instrument ("Mortgage") and Note ("Note"): 4/13/2007
Loan Number:
Property Address: 146 Cherry Hill Lane Santa Teresa, NM 88008        ("Property")

THIS SHARED APPRECIATION DISCLOSURE is made this 11th day of September, 2013, and is incorporated into and shall be deemed to supplement the Modification Agreement (the "Agreement") of the same date given by the undersigned Borrower(s). The Agreement contains a shared appreciation feature that requires the Borrower(s) to make an additional payment based on the future appreciation of the Property.

### SHARED APPRECIATION AMOUNT

I agree to share in any future appreciation of the market value of the Property that occurs between the date of modification and the date the Property is sold, refinanced or the Loan reaches maturity. The Shared Appreciation Amount recognizes certain improvements made to the property after the Modification Effective Date. In no event shall the Shared Appreciation Amount collected be more than the Deferred Principal Balance. The following are examples of how such shared appreciation may be calculated.

### EXAMPLES

This share appreciation modification is available to borrower(s) whose unpaid principal balance exceeds the market value of their Property. Under the shared appreciation modification, the total debt amount owed would be reduced, resulting in a new principal balance made up of two parts: (i) an Interest Bearing Principal Balance that has been adjusted based upon the market value at the time of modification and (ii) a Deferred Principal Balance that does not bear interest and is eligible to be forgiven over a three (3) year period.

For purposes of this disclosure, the scenarios below are based on the following modification terms:

- A market value of $100,000 at the time of modification.
- A New Principal Balance of $130,000.
- An Interest Bearing Principal Balance of $100,000.
- A Deferred Principal Balance of $30,000.

After four (4) years of making each monthly payment on time, I decide to sell the Property and receive an Arm's Length offer to purchase from an unrelated third party in the amount of:

### 1   $100,000, EQUIVALENT TO NO APPRECIATION AFTER THE MODIFICATION

Since the market value of the Property remained the same from the date of modification to the date I decided to sell the Property, I would owe a Shared Appreciation Amount of $0.

- All $30,000 of Deferred Principal Balance would have been already forgiven.
- The Shared Appreciation Amount would be equal to 25% of $0 in appreciation (25% x $0 = $0) or $0.
- Therefore, I would not be required to pay anything as the Shared Appreciation Amount.

### 2   $120,000, EQUIVALENT TO AN APPRECIATION OF TWENTY PERCENT (20%) AFTER THE MODIFICATION

Since the market value of the Property increased from $100,000 to $120,000 from the date of modification to the date I decided to sell the Property, I would owe a total Shared Appreciation Amount of $5,000.

- All $30,000 of Deferred Principal Balance would have been already forgiven.

8



- The Shared Appreciation Amount would be equal to 25% of the $20,000 in total appreciation (($120,000 - $100,000) x 25% = $5,000) or $5,000.
- Since the Shared Appreciation Amount of $5,000 is less than the Deferred Principal Balance ($30,000), I would be required to pay $5,000 as the Shared Appreciation Amount.
- I would receive the remaining 75% of the appreciation or $15,000 ($20,000 - $5,000 = $15,000).

### 3 $120,000, EQUIVALENT TO AN APPRECIATION OF TWENTY PERCENT (20%) AFTER THE MODIFICATION(WITH A SUBSEQUENT CAPITAL IMPROVEMENT MADE TO THE PROPERTY.)

Similar to example number 2 above, the market value of the Property increased from $100,000 to $120,000 from the date of modification to the date I decided to sell the Property. However, in this instance, I have also produced evidence of a $5,000 Subsequent Capital Improvement made to the property after the modification effective date. As a result, I would receive a credit for the Subsequent Capital Improvement and owe a total Shared Appreciation Amount of $3,750.

- All $30,000 of Deferred Principal Balance would have been already forgiven.
- The Shared Appreciation Amount would be equal to 25% of the $15,000 in appreciation achieved after deduction of the $5,000 for the Subsequent Capital Improvement (($120,000 - $100,000 - $5,000) x 25% = $3,750) or $3,750.
- Since the Shared Appreciation Amount of $3,750 is less than the Deferred Principal Balance ($30,000), I would be required to pay $3,750 as the Shared Appreciation Amount.
- I would receive a full credit of $5,000 for the Subsequent Capital Improvement plus the remaining 75% of the appreciation or $11,250 ($15,000 - $3,750 = $11,250).

### 4 $225,000, EQUIVALENT TO AN APPRECIATION OF ONE HUNDRED AND TWENTY FIVE PERCENT (125%) AFTER THE MODIFICATION

Since the market value of the Property increased from $100,000 to $225,000 from the date of modification to the date I decided to sell the Property, I would owe a total Shared Appreciation Amount of $30,000.

- All $30,000 of Deferred Principal Balance would have been already forgiven.
- The Shared Appreciation Amount would be equal to 25% of the $125,000 in appreciation (($225,000 - $100,000) x 25% = $31,250) or $31,250.
- Since the Shared Appreciation Amount of $31,250 is greater than the Deferred Principal Balance ($30,000), I would only be required to pay $30,000 as the Shared Appreciation Amount.
- I would receive the remaining 75% of the appreciation ($93,750) plus an additional $1,250 ($31,250 - $30,000) because the amount of appreciation actually due cannot exceed the total Deferred Principal Balance of $30,000.

### OTHER CONSIDERATIONS

1. Borrower(s) should seek independent counseling from a lawyer, a HUD-certified mortgage counselor and/or a tax advisor regarding (A) the trade-off between a current reduction in the size of the mortgage versus the promise to give up part of the future appreciation of your Property, and (B) the tax consequences of the principal forgiveness and shared appreciation features of the Agreement.
2. The U.S. Department of Housing and Urban Development list of approved housing counselors may be found at: http://www.hud.gov/offices/hsg/sfh/hcc/fc/
3. The Agreement could have an effect on future refinancing of the Property. If I refinance or pay off the Note after entering into this Agreement, I will be required to pay part of the appreciation in the value of the Property as described in the Agreement.

I/we have read the above disclosure and acknowledge receiving a copy by signing below.

Borrower _____  Date CQ-13-2013

Borrower _____  Date 9-P3 -2013

9

FILED
3rd JUDICIAL DISTRICT COURT
Dona Ana County
4/5/2024 10:42 AM
BERNICE A. RAMOS
CLERK OF THE COURT
Melissa Wood

STATE OF NEW MEXICO
COUNTY OF DONA ANA
THIRD JUDICIAL DISTRICT COURT

No.    D-307-CV-2024-00839    Martin, James T.

HSBC BANK USA, NATIONAL ASSOCIATION AS TRUSTEE FOR
RENAISSANCE HOME EQUITY LOAN ASSET-BACKED
CERTIFICATES, SERIES 2007-3,

     Plaintiff,

v.

MICHAEL ANNABI, PERLA ANNABI, NATIONSBANC
MORTGAGE CORPORATION, CAPITAL ONE BANK (USA), N.A.,
NPG OF TEXAS, L.P. D/B/A/ KVIA TV-7, UNITED STATES
DEPARTMENT OF JUSTICE, DEPARTMENT OF THE TREASURY -
INTERNAL REVENUE SERVICE. SUNNY RIDGE HOMEOWNERS
ASSOCIATION INC., A NEW MEXICO NONPROFIT
CORPORATION AND CRSUNNY RIDGE HOMEOWNERS
ASSOCIATION INC., A NEW MEXICO NONPROFIT
CORPORATIONOSS RIVER BANK C/O SUNLIGHT FINANCIAL,

     Defendants.

## AFFIDAVIT OF POSSESSION OF ORIGINAL NOTE

STATE OF NEW MEXICO    )
                        )   ss.
COUNTY OF BERNALILLO    )

1.     Amanda Gates, being first duly sworn, upon oath, states that she is an attorney at

Rose Ramirez & Associates, P.C., attorneys for the Plaintiff, and makes this Affidavit for and on

Plaintiff's behalf.

2.     Counsel for Plaintiff is in possession of the original Note on the loan that is the

subject of the suit.

3.    A true and correct copy of the original Note is attached hereto as Exhibit "A" for reference.

ROSE RAMIREZ & ASSOCIATES, P.C.

By _____

AMANDA GATES
Attorneys for Plaintiff
7430 Washington Street, NE
Albuquerque, NM 87109
Telephone: (505) 833-3036
Facsimile: (505) 833-3040
E-mail: Amanda.Gates@RRAfirm.com

STATE OF NEW MEXICO    )
                       )  ss.
COUNTY OF BERNALILLO    )

This instrument was acknowledged before me on  **April 5** , 20 **24** , by

Amanda Gates.

Christine Adele Bonaccorsi          4.5.24
Notary Public                        Date

My commission expires:  February 7, 2027

CHRISTINE ADELE BONACCORSI
Notary Public - State of New Mexico
Commission # 1139651
My Comm. Expires Feb 7, 2027

# FIXED RATE STEPPED PAYMENT NOTE

## THIS NOTE CONTAINS PROVISIONS WHICH WILL INCREASE MY MONTHLY PAYMENT.

| April 13, 2007 | Santa Teresa | NM |
|---|---|---|
| [Date] | [City] | [State] |

### 146 Cherry Hill Lane, Santa Teresa, NM 88008
[Property Address]

### 1.    BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 252,000.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Delta Funding Corporation**. I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2.    INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 8.390%.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

### 3.    PAYMENTS

#### (A)    Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 01 day of each month beginning on Jun 01, 2007. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest it will be applied to interest before Principal. If, on May 1st, 2037, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 1000 Woodbury Road P.O. Box 9009 Woodbury, NY 11797 or at a different place if required by the Note Holder.

#### (B)    Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $1,826.34 for the first 120 months of this Note, and thereafter will be in the amount of U.S. $2,065.67. The Note Holder will notify me prior to the date of a change in the amount of my monthly payment.

### 4.    BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note. I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment unless the Note Holder agrees in writing to those changes. However, if any partial Prepayment is made prior to the time of the payment change in Section 3(B) above, at the time of the payment change, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the unpaid principal in full on the Maturity Date at the interest rate set forth in Section 2 in substantially equal payments. A partial Prepayment made prior to the time of the payment change in Section 3(B) above will result in a decrease in the amount of my monthly payments due after the time of the payment change in Section 3(B) above. If the partial Prepayment is made after the time of the payment change in Section 3(B) above, the amount of my monthly payment will not decrease; however, the principal and interest required under this Note will be paid prior to the Maturity Date.

### 5.    LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.



EXHIBIT
A

6. **BORROWER'S FAILURE TO PAY AS REQUIRED**

    (A) **Late Charge for Overdue Payments**

    If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5% of my overdue payment of interest and/or principal and interest. I will pay this late charge promptly but only once on each late payment.

    (B) **Default**

    If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

    (C) **Notice of Default**

    If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

    (D) **No Waiver By Note Holder**

    Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

    (E) **Payment of Note Holder's Costs and Expenses**

    If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorney's fees.

7. **GIVING OF NOTICES**

    Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address. Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

8. **OBLIGATIONS OF PERSONS UNDER THIS NOTE**

    If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

9. **WAIVERS**

    I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

10. **UNIFORM SECURED NOTE**

    This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Lender may require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. If Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission, Lender also may require immediate payment in full. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender requires immediate payment in full under this Section 18, Lender will give me a notice which states this requirement. The notice will give me at least 30 days to make the required payment. The 30-day period will begin on the date the notice is given to me in the manner required by Section 15 of this Security Instrument. If I do not make the required payment during that period, Lender may act to enforce its rights under this Security Instrument without giving me any further notice or demand for payment.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ Seal
Perla Annabi                              -Borrower

_____ Seal
Michael Annabi                            -Borrower

_____ Seal
                                          -Borrower

_____ Seal
                                          -Borrower

*[Sign Original Only]*

# ALLONGE

RE: Perla  Annabi
    Michael  Annabi

LOAN #: ▮▮▮▮▮▮

PROPERTY ADDRESS:     146 Cherry Hill Lane,  Santa Teresa, NM 88008
    ADDRESS #2:
    ADDRESS #3:

PAY TO THE ORDER OF:
                     HSBC BANK USA, NATIONAL ASSOCIATION AS
                     INDENTURE TRUSTEE UNDER THE APPLICABLE AGREEMENT

WITHOUT RECOURSE

    DELTA FUNDING CORPORATION


                            BY:   *Carol Hollmann*

                                  _____
                                  Carol Hollmann, Vice President

Loan #████████

## ALLONGE TO NOTE

This endorsement is a permanent part of the Note in the amount of $252,000.00

NOTE DATE: 04/13/2007

BORROWER NAME: PERLA ANNABI
AND MICHAEL ANNABI

PROPERTY: 146 CHERRY HILL LANE, SANTA TERESA, NM 88008

PAY TO THE ORDER OF:

HSBC BANK USA, NATIONAL ASSOCIATION AS TRUSTEE FOR RENAISSANCE HOME
EQUITY LOAN ASSET-BACKED CERTIFICATES, SERIES 2007-3

WITHOUT RECOURSE:

HSBC BANK USA, NATIONAL ASSOCIATION AS INDENTURE TRUSTEE UNDER THE
APPLICABLE AGREEMENT

Signer: Man Yu Wong (Cindy)
Title: Senior Vice President

Loan#

## ALLONGE TO NOTE

This endorsement is a permanent part of the Note in the amount of $252,000.00

NOTE DATE: 4/13/2007

BORROWER NAME: Perla Annabi
Michael Annabi

PROPERTY: 146 Cherry Hill Lane, Santa Teresa, NM 88008

PAY TO THE ORDER OF:

WITHOUT RECOURSE:
HSBC BANK USA, NATIONAL ASSOCIATION AS TRUSTEE FOR RENAISSANCE HOME
EQUITY LOAN ASSET-BACKED CERTIFICATES, SERIES 2007-3, BY ITS ATTORNEY IN
FACT, OCWEN LOAN SERVICING, LLC

Signer: Yamile Shields
Title: Servicing Operations Specialist

FILED
3rd JUDICIAL DISTRICT COURT
Dona Ana County
4/5/2024 2:18 PM
BERNICE A. RAMOS
CLERK OF THE COURT
Melissa Wood

STATE OF NEW MEXICO
COUNTY OF DONA ANA
THIRD JUDICIAL DISTRICT COURT

HSBC BANK USA, NATIONAL
ASSOCIATION AS TRUSTEE FOR
RENAISSANCE HOME EQUITY LOAN,

Plaintiff,

V.

Case No.    D-307-CV-2024-839

Judge:

MICHAEL ANNABI, ET AL.,

**James T. Martin**

Defendant.

## ORDER REQUIRING SCHEDULING REPORTS, A DISCOVERY PLAN, EXPERT WITNESS DISCLOSURE, AND LIMITING STIPULATIONS TO ENLARGE TIME FOR RESPONSIVE PLEADINGS

IT IS SO ORDERED:

A.    Plaintiff shall serve a copy of this order on each defendant with the summons and complaint and file a certificate of such service. Parties other than plaintiffs who assert claims against others who have not been served with this order shall serve a copy of this order on those against whom they assert claims with the pleading asserting such claims and shall file a certificate of such service.

B.    Within sixty (60) calendar days after the initial pleading is filed, parties of record shall file a scheduling report with copies to opposing parties and the assigned judge. Parties shall confer and are encouraged to file a Joint Scheduling Report, LR3-Form 2.12 NMRA for Track A or LR3-Form 2.13 for Tracks B and C, or, if they cannot agree, file an individual Scheduling Report, LR3-Form 2.13 NMRA. *See* copies of forms attached hereto.

C.    Any party who enters an appearance in the case more than sixty (60) calendar days after the filing of the initial pleading shall file a scheduling report within ten (10) business days and deliver a copy to the assigned judge.

D.    If all parties are not of record within sixty (60) calendar days of the filing of the initial pleading, the party making claims against the absent parties *(Plaintiff for Defendants, Third-Party Plaintiffs for Third-Party Defendants, etc.)* shall, within five (5) business days after the sixtieth (60th) day, file and serve parties of record and deliver to the assigned judge, a written explanation why the case is not at issue and how much time is needed before the case will be at issue. The notice shall be titled "Delay in Putting the Matter at Issue."

E.    Counsel or parties who do not have attorneys may not stipulate to an enlargement of time greater than fourteen (14) calendar days for the filing of a responsive pleading without a motion and order. The motion shall state with particularity the reason(s) an enlargement is in the best interests of the parties. A copy of the motion and stipulation shall be delivered to all parties as well as counsel. The enlargement requested shall be for a specified time.

F.    When all parties have been joined and the case is at issue, the parties shall immediately notify in writing the assigned judge and the alternative dispute resolution coordinator.

G.    If appropriate, the court will refer this matter to settlement facilitation under Part VI of the Local Rules of the Third Judicial District Court.

H.    Within seventy-five (75) calendar days from the date the initial pleading is filed, or fifteen (15) calendar days after the parties alert the Court that the case is at issue, the parties shall either:

   (I)    stipulate to a discovery plan and file the stipulation with the court, or

   (2)    request a hearing to establish a discovery plan pursuant to Paragraph F of Rule 1-026 NMRA.

   (3)    In the absence of a stipulated discovery plan or a timely request from a party for a hearing to establish a discovery plan, the following plan shall go into effect:
         Within one hundred (100) calendar days after the initial pleading was filed or fifteen (15) calendar days after a party has entered the suit, whichever is the later date, each party shall provide to all other parties:

         a.    The name and, if known, the address and telephone number of each individual likely to have discoverable information relevant to disputed issues raised by the pleadings, identifying the subjects of the information;

b.     A copy of, or a description by category and location of, all documents, data compilations, and tangible things in the possession, custody, or control of the party that are relevant to disputed issues raised by the pleadings;

c.     A computation of any category of damages claimed by the disclosing party, providing copies or making available for inspection and copying the documents or other evidentiary materials and medical records and opinions, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered;

d.     For inspection and copying, any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment;

e.     If the medical condition of a party is at issue, such party shall give a medical release authorization to opposing parties. The parties shall confer regarding the nature and extent of the release and stipulate, if possible. If the parties cannot agree, each party shall file a memorandum with a proposed medical release authorization advocating that party's proposed form to the court. A copy of the memorandum and proposed form shall be delivered to the assigned judge. Rule 1-007.1 NIMRA shall apply.

I.     Pursuant to Rule 1-026(E) NMRA, parties shall reasonably supplement discovery required in Subparagraphs (3)(a) through (e) of Paragraph H of this Order.

J.     Intent to Call Expert Witness - Disclosure. All parties shall exchange a "Notice of Intent to Call Expert Witness(es)" listing the names, addresses and phone numbers for all anticipated experts, including a brief summary of the subject matter of each witness' testimony. If an expert has not yet been identified by a party, the parties must list the specialized area(s) in which an expert is anticipated to be retained and a brief summary of the areas or issues on which the expert is expected to testify.

With respect to each expert listed, all parties are to observe their continuing duty to timely supplement discovery and shall further abide by the requirements of Section 8 of the attachment to the Rule 16(B) Scheduling Order.



_____
DISTRICT COURT JUDGE

Delivered to Plaintiff on April 5, 2024

Bernice A. Ramos
Clerk of the District Court

/s/ Melissa Wood
_____
Judicial Specialist

STATE OF NEW MEXICO
COUNTY OF DONA ANA
THIRDJUDICIAL DISTRICT COURT

Plaintiff

vs.

NO.: D-307-CV
Judge:

Defendant

## JOINT SCHEDULING REPORT STIPULATING TO TRACK A

Come now all the parties to this case, (by their counsel of record) and stipulate as

follows:

1    The court has subject matter and personal jurisdiction, and venue is proper.

2    This case is appropriate for assignment to Track A

3    The parties do not intend to amend the pleadings or file dispositive motions

*4    All parties will be ready for trial by_____(no more than six (6) months from
filing of complaint)*

5    Witness lists will be exchanged and filed forty-five (45) days before trial

6    Discovery limited to interrogatories, requests for production and admission and no more
than two (2) depositions per party.

7    All parties and counsel will either (a) select a facilitator by agreement of the parties, or
(b) request the court's ADR coordinator to select a facilitator and will engage in a
settlement conference within ninety (90) days from the date of the filing of the complaint.
The parties may move for enlargement of time for the settlement conference for good
cause shown the parties shall share the facilitator's fee, if any, equally.

8. Exhibits: exchanged at least fifteen (15) days before trial.

This Jury_____ 6 ___ 12 non-jury __ ) matter will take_____hours to try.

9. Conflicting court hearings (or other conflicts which show good cause for not setting trial)

for two (2) months following the date the matter is ready for trial:

_____

_____

10. Other: _____

SUBMITTED BY:

Name of party:
Attorney:
Address:

Telephone Number

Name of party:
Attorney:
Address:

Telephone Number

## CERTIFICATE OF MAILING

I HEREBY CERTIFY that I mailed, delivered or faxed a copy to the assigned judge and each party or each party's attorney on the _____ day of _____, 20 _____.

_____
Signature

LR3-Form 2.13. (_____'s) (Joint) scheduling report.

STATE OF NEW MEXICO
COUNTY OF DOÑA ANA
THIRD JUDICIAL DISTRICT COURT

_____, Plaintiff

vs.

                                        NO.: D-307-CV-
                                        Judge:
_____, Defendant

        (_____'S) (JOINT) SCHEDULING REPORT

1. This case should be assigned to Track _____.
2. Jurisdiction and Venue: _____Stipulated; _____ Disputed;
   Why: _____.
3. _____Non Jury; _____ 6-person jury; _____12-person jury.
4. Significant legal issues, if any: _____
   _____.

5. Trial witnesses presently known (defendant's, plaintiff's, etc.): _____
   State expert type: _____.

6. Settlement:
   _____ [I] [We] have sufficient information to evaluate the case.
   _____ [I] [We] have provided sufficient information for opposing parties to evaluate the
   case.
   _____ [I] [We] need the following information from _____ to evaluate the case:
   _____.

   _____ [I] [We] need the following discovery to obtain information sufficient to evaluate
   the case:
   _____. Explain why such information cannot be
   obtained informally without formal discovery:
   _____.

   _____ [I] [We] have scheduled a settlement conference on _____, 20_____ with
   _____ (facilitator) or have requested the court's ADR coordinator to refer
   to facilitation.

                                   **Or**
   _____ [I] [We] request that this not be referred to facilitation because:
   _____.

   The possibility of settlement is _____ good, _____ fair, _____ poor.

7. Discovery:
   [I] [We] estimate it will take _____ months to complete discovery. *(Attach discovery plan if stipulated, or request for setting a discovery conference if wanted.)* If any party requests a discovery conference, answer the following:
   The party submitting this scheduling report intends to do the following discovery:

   _____.

   *(If this is a joint scheduling report, each party shall answer this question.)*
   [Plaintiff] [Defendant] intends to do the following discovery:

   _____

   _____.

8. [I] [We] estimate that trial will take _____ court days to try.
9. Dates counsel will not be available for trial due to the following conflicting court settings *(beginning with the date immediately following the time you estimate discovery will be completed):* _____
10. Stipulations: _____.
11. Other:
    _____.


SUBMITTED BY:

Name of party:          _____
Attorney:               _____
Address:                _____
                        _____
Telephone Number        _____


Name of party:          _____
Attorney:               _____
Address:                _____
                        _____
Telephone Number        _____


## CERTIFICATE OF MAILING

I HEREBY CERTIFY that I mailed, delivered or faxed a copy to the assigned judge and each party or each party's attorney on the _____ day of _____, 20 _____.


                    _____
                                    Signature

FILED
3rd JUDICIAL DISTRICT COURT
Dona Ana County
4/5/2024 10:42 AM
BERNICE A. RAMOS
CLERK OF THE COURT
Melissa Wood

STATE OF NEW MEXICO
COUNTY OF DONA ANA
THIRD JUDICIAL DISTRICT COURT

No. D-307-CV-2024-00839          Martin, James T.

HSBC BANK USA, NATIONAL ASSOCIATION AS TRUSTEE FOR
RENAISSANCE HOME EQUITY LOAN ASSET-BACKED CERTIFICATES,
SERIES 2007-3,

    Plaintiff,

v.

MICHAEL ANNABI, PERLA ANNABI, NATIONSBANC MORTGAGE
CORPORATION, CAPITAL ONE BANK (USA), N.A., NPG OF TEXAS, L.P.
D/B/A/ KVIA TV-7, UNITED STATES DEPARTMENT OF JUSTICE,
DEPARTMENT OF THE TREASURY - INTERNAL REVENUE SERVICE,
SUNNY RIDGE HOMEOWNERS ASSOCIATION INC., A NEW MEXICO
NONPROFIT CORPORATION AND CROSS RIVER BANK C/O SUNLIGHT
FINANCIAL,

    Defendants.

## PLAINTIFF'S CERTIFICATION OF PRE-FILING NOTICE

I, **Allen H. Elijah (name)**, **Contract Management Coordinator** *(title)*, for

Plaintiff certify that as of **11/03/2023** *(date)* Plaintiff provided pre-filing notice to

Defendant of the following:

    1.    A list and brief description of each of the types of loss mitigation options available
to Defendant by the owner or assignee of Defendant's mortgage loan and the actions Defendant
must take to be evaluated for such loss mitigation options;

    2.    Notification as to whether the loan is federally backed or a government sponsored
enterprise (GSE) loan, and if so, what federal or GSE-specific relief options are available to
Defendant;

    3.    The name of the entity that holds the loan, and the contact information for the loan
servicer;

    4.    A list of resources, substantially in a form approved by the Supreme Court, that
Defendant may contact for assistance; and

    5.    Notice to Defendant of the New Mexico Homeowner Assistance Fund (HAF) and
ability to request a stay while applying for HAF.

I further certify that at least one of the following has been met *(check all that apply)*:

RCR No. 1187          1

☐ Defendant submitted a complete loss mitigation application and the servicer has completed review of the application. Defendant remained delinquent at all times since submitting the application, and was denied for loan modification or did not accept another loss mitigation offer.

☐ The property securing the mortgage loan is abandoned according to the laws of the State of New Mexico.

X The loan was delinquent for one hundred twenty (120) days prior to the filing of the complaint.

☐ The statute of limitations applicable to the foreclosure action being taken will expire within one hundred twenty (120) days if the Court does not allow the filing of the Foreclosure Complaint. The statute of limitations will expire on _____, _____.

_Allen H. Elijah_ 12-7-2023
Signature

**Allen H. Elijah, Contract Management Coordinator**
Printed Name

ROSE RAMIREZ & ASSOCIATES, P.C.
Law Firm Name (*if applicable*)

1661 Worthington Road Suite 100, West Palm Beach, FL 33409
Physical Address

**800 - 682-8000**
Telephone Number

Affidavits@ocwen.com
E-Mail Address

**Servicer for Plaintiff**
Relationship to Plaintiff



STATE OF NEW MEXICO
COUNTY OF DONA ANA
THIRD JUDICIAL DISTRICT COURT

2407293     APR 9, 2024 11:13:52 AM     PAGES: 2
LIS PENDENS     Deputy: Kyanne Sherman
Amanda López Askin, County Clerk, Dona Ana, NM



No.   D-307-CV-2024-00839

HSBC BANK USA, NATIONAL ASSOCIATION AS TRUSTEE FOR
RENAISSANCE HOME EQUITY LOAN ASSET-BACKED
CERTIFICATES, SERIES 2007-3,

     Plaintiff,

v.

MICHAEL ANNABI, PERLA ANNABI, NATIONSBANC
MORTGAGE CORPORATION, CAPITAL ONE BANK (USA), N.A.,
NPG OF TEXAS, L.P. D/B/A/ KVIA TV-7, UNITED STATES
DEPARTMENT OF JUSTICE, DEPARTMENT OF THE TREASURY -
INTERNAL REVENUE SERVICE, SUNNY RIDGE HOMEOWNERS
ASSOCIATION INC., A NEW MEXICO NONPROFIT
CORPORATION AND CROSS RIVER BANK C/O SUNLIGHT
FINANCIAL,

     Defendants.

## NOTICE OF LIS PENDENS

Notice is hereby given of the pendency of the above-entitled suit in the referenced Court

which action affects or may affect the title to real estate.

1.     Names of parties to suit are as shown in the caption above.

2.     Object of Action:     To foreclose a Mortgage on the described premises by judicial action.

3.     Description of Real Estate affected and concerned:

     A.     Legal Description:

     Lot numbered 20 of SUNNY RIDGE SUBDIVISION, Dona Ana
     County, New Mexico, as the same is shown and designated on the
     plat of said SUNNY RIDGE SUBDIVISION, filed in the Office of
     the County Clerk of Dona Ana County New Mexico on July 1,
     1996, in Plat Book 18, Folio 496-497,

including any improvements, fixtures, and attachments, such as, but not limited to, manufactured homes.

B.  Street Address:    146 Cherry Hill Lane, Santa Teresa, New Mexico, 88008. (If there is a conflict between the legal description and the street address, the legal description shall control.)

The action is to foreclose a Mortgage concerning which the following information is provided:

1.  Date of Mortgage    April 13, 2007

2.  Parties to Mortgage

A.  Mortgagor (Borrower):  Perla Annabi and Michael Annabi

B.  Mortgagee:    HSBC Bank USA, National Association as Trustee for Renaissance Home Equity Loan Asset-Backed Certificates, Series 2007-3 is entitled to enforce the Note and Mortgage.

C.  The Mortgage was recorded at the Doan Ana County Clerk's office on April 18, 2007 at 3:36 PM, in Book 806, at Page 1091.

The Plaintiff claims an interest in the described real estate. This Lis Pendens shall serve as notice to any and all persons that any subsequently recorded conveyance or interest in said real estate shall be considered a subsequent purchase or encumbrance and shall be bound by the proceedings taken after the recording of this notice the same as if such person were party to this action.

ROSE RAMIREZ & ASSOCIATES, P.C.

By
AMANDA GATES
Attorneys for Plaintiff
7430 Washington Street, NE
Albuquerque, NM 87109
Telephone: (505) 833-3036
Facsimile: (505) 833-3040
E-mail: Amanda.Gates@RRAfirm.com